# The Constitutionality of Cooperative International Law Enforcement Activities Under the Emoluments Clause

The Emoluments Clause of the Constitution does not bar a proposed cooperative maritime counter-narcotics operation, because the foreign naval personnel assisting U.S. law enforcement personnel would not hold an "Office of Profit or Trust" under the United States.

October 7, 1996

MEMORANDUM OPINION FOR THE DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

This memorandum responds to your request for our advice on certain legal issues raised by proposed bilateral executive agreements providing for cooperative maritime counterdrug enforcement activities in the Caribbean. In particular, you have asked whether the agreements would be impermissible under the Emoluments Clause, Article I, Section 9, Clause 8 of the Constitution, and this opinion is confined to that question.

## I.

You have explained that the United States has had discussions with several European countries with interests in the Caribbean about possible executive agreements addressing maritime counterdrug enforcement activities in that region. You have further explained the general structure of the proposed cooperative "shiprider" program that would be established under the terms of the agreements:

> Each of the proposed agreements would have reciprocal provisions, under which, pursuant to standing or ad hoc permission, duly authorized state vessels of each party would be able to enter the territorial sea of the other to take drug law enforcement action against vessels not flying the flag of the coastal state, and against the persons on board them. Such law enforcement action could include enforcement of the coastal state's laws, (*e.g.*, by seizing the vessel and apprehending the persons, for subsequent turnover to the coastal state's enforcement authorities) or enforcement of the seizing state's laws (in which case the vessel and persons would be taken out of the coastal state's territorial of sea for prosecution in a territory of the seizing state). [1]

---

[1] Memorandum for Richard Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, from Mark M. Richard, Deputy Assistant Attorney General, Criminal Division, *Re: Request for Office of Legal Counsel Views on Proposed Reciprocal Maritime Counterdrug Agreements* at 1 (May 31, 1996) ("Criminal Division Submission").

As an example, you have provided the text of a draft agreement between the United States and the United Kingdom (acting on behalf of Bermuda, the British Virgin Islands, and other islands) concerning maritime counterdrug operations in the Caribbean ("U.S.-U.K. Draft Agreement" or "Agreement").[2] The Agreement provides that the parties "shall continue to cooperate in combatting illicit maritime drug traffic to the fullest extent possible."[3] To that end, the parties agree to establish a joint law enforcement "shiprider" program. In relevant part, the Agreement provides that the U.S. government may designate qualified Coast Guard officials to act as shipriders who may:

> a. embark on British law enforcement vessels;
>
> b. authorize the pursuit, by the British law enforcement vessels on which they are embarked, of suspect vessels and aircraft fleeing into United States waters;
>
> c. authorize the British law enforcement vessels on which they are embarked to conduct counter-drug patrols in United States waters;
>
> d. enforce the laws of the United States in United States waters, or seaward therefrom, in the exercise of the right of hot pursuit or otherwise in accordance with international law; and
>
> e. authorize the British law enforcement vessels on which they are embarked to assist in the enforcement of the laws of the United States seaward of the territorial sea of Anguilla, Bermuda, the Cayman Islands, Montserrat, and Turks and Caicos.[4]

The Agreement further provides that crew members of the British law enforcement vessel may assist in the search and seizure of property, detention of a person, and use of force pursuant to the Agreement if expressly requested to do so by the U.S. shiprider.

The provisions of the U.S.-U.K. Agreement are fully reciprocal; identical or equivalent terms apply to create a shiprider program for the United Kingdom. Congress has expressly authorized the President to enter into reciprocal maritime agreements with other countries in order to promote international cooperation to curtail drug traffic. *See* International Narcotics Control Act of 1992, Pub. L. No. 102–583, 106 Stat. 4914.

---

[2] *Agreement Between the Government of the United States of America and the Government of the Kingdom of the United Kingdom of Great Britain and Northern Ireland on behalf of the Governments of Anguilla, Bermuda, the British Virgin Islands, the Cayman Islands, Montserrat, and the Turks and Caicos Islands, Concerning Maritime Counter-Drug Operations in the Western Atlantic and Caribbean Areas* (Attachment A to Criminal Division Submission).

[3] U.S.-U.K. Draft Agreement, article 1.

[4] U.S.-U.K. Draft Agreement, article 6.

## II.

The Emoluments Clause, U.S. Const. art. 1, § 9, cl. 8, provides:

> No Title of Nobility shall be granted by the United States: And
> no Person holding any Office of Profit or Trust under them, shall,
> without the Consent of the Congress accept of any present, Emolu-
> ment, Office, or Title, of any kind whatever, from any King, Prince,
> or foreign State.

The Emoluments Clause was intended to protect foreign ministers, ambassadors, and other officers of the United States from undue influence and corruption by foreign governments. Governor Randolph explained the purposes underlying Article 1, Section 9, Clause 8 in the Virginia Ratification Convention. He stated that it had been prompted by the gift of a snuff box by the King of France to Benjamin Franklin, then Ambassador to France. It therefore "was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states." [5]

We understand that the question has arisen whether the U.S.-U.K. shiprider program violates the Emoluments Clause by authorizing U.K. naval personnel, under instruction of the U.S. shiprider, to enforce U.S. law "seaward of the territorial sea of Anguilla, Bermuda, the Cayman Islands, Montserrat, and Turks and Caicos." [6] According to the Criminal Division Submission, *see id.* at 1–2, the concern regarding the Emoluments Clause stems at least in part from a prior opinion of this Office that concluded that the Clause prevented foreign government personnel — who receive pay from their own government — from being designated U.S. federal law enforcement agents. [7]

We conclude that the U.K. naval personnel assisting U.S. law enforcement personnel under the shiprider program do not hold an "Office of Profit or Trust under [the United States]" within the meaning of the Emoluments Clause, and, thus, the Emoluments Clause presents no bar to the cooperative maritime counterdrug operations as outlined in the Criminal Division Submission and the U.S.-U.K. Draft Agreement. The U.K. naval personnel owe no duty of loyalty to the United States that would be compromised by payment from the British Royal Navy. Rather, they are, at all times, operating as members of the Royal Navy, owing their duty to the Royal Navy, and participating in a cooperative endeavor with the United States pursuant to the terms of an agreement executed by their own government. If British personnel enforce U.S. law, it is merely derivative of their duty to obey the dictates of the government of the United Kingdom.

---

[5] 3 *The Records of the Federal Convention of 1787*, at 327 (Max Farrand, ed., rev. ed. 1966) ("Farrand").

[6] U.S.-U.K. Draft Agreement, article 6.

[7] *See Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States*, 12 Op. O.L.C. 67 (1988) ("1988 Opinion").

Simply put, British pay could not undermine the "undivided loyalty" [8] of the British naval personnel to the United States because their ultimate loyalty is to Britain, not the United States.

The Criminal Division Submission cites the 1988 Opinion of this Office, in which we concluded that "the Emoluments Clause precludes the designation of foreign agents to enforce federal law in the absence of congressional consent." [9] The 1988 Opinion concluded that "[a]s a matter of general principle, anyone exercising law enforcement powers on behalf of the United States must be viewed as holding an office of trust under the Emoluments Clause." [10] We reject this sweeping and unqualified view.

Until 1988, we had never interpreted the Emoluments Clause as applying to persons entirely outside the federal government. To be sure, we concluded in 1982 that the Emoluments Clause applies more broadly than just to the "offices" covered by the Appointments Clause, [11] and also reaches " 'lesser functionaries' subordinate to officers." [12] But such " 'lesser functionaries' subordinate to officers" plainly are in the United States Government.

While we understand the concern behind the 1988 opinion — certain governmental functions are of such importance that their assignment to persons under obligation to a foreign government may raise serious problems — we see no basis for extending the Emoluments Clause to persons having *no* position or employment in the United States Government. [13] First, the expressed purpose for the Emoluments Clause was to "preserv[e] foreign Ministers & other officers of the U.S. independent of external influence." [14] This formulation supports the view that the Emoluments Clause extends only to those, like foreign ministers, who have positions in the Government of the United States. Second, the ordinary meaning of the term "office" does not include assignments of duties to persons who

---

[8] *Id.* at 69.

[9] *Id.* at 68.

[10] *Id.* at 69.

[11] *See Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 157–58 (1982).

[12] *See Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986). The Appointments Clause applies only to persons (1) in a position of employment (as opposed to an independent contractor), (2) within the federal government (3) that carries significant authority. *See Constitutional Limitations on Federal Government Participation in Binding Arbitration*, 19 Op. O.L.C. 208, 210–11 (1995). The Emoluments Clause is not so limited. Most significantly, the Emoluments Clause applies regardless of whether the person exercises "significant authority." *See Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982) ("The problem of divided loyalties can arise at any level.").

[13] In the same year we concluded that Civilian Aides to the Secretary of the Army occupied an "Office of Trust" and thus were covered by the Emoluments Clause. In contrast to the U.K. shipriders, however, there was no question that, as a threshold matter, the Civilian Aides held an "Office." As the opinion explains, certain Army regulations governed Civilian Aides, the Aides were chosen by the Secretary according to specified criteria, and they were subject to security clearances and standards of conduct. They served a "term of office" of two years and enjoyed the "responsibilities and privileges" of the position until formal "separation action" was taken by the Secretary. Memorandum for James H. Thessin, Assistant Legal Adviser for Management, United States Department of State, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Emoluments Clause to a Civilian Aide to the Secretary of the Army* at 3 (Aug. 29, 1988).

[14] 2 Farrand at 389.

hold no positions in the government. In interpreting the term even outside the context of the Constitution, the Supreme Court has stated that "[a]n office is a public station conferred by the appointment of government" and that "[t]he term embraces the idea of tenure, duration, emolument and duties fixed by law." [15]

Assisting in the enforcement of federal law does not, in itself, make a person an officer for purposes of the Emoluments Clause. If so, all persons, including state actors, who enforce federal law would be barred from accepting any "emolument" from a foreign government. Thus, for example, state governors, local officers, and qui tam relators would be barred from accepting an appointment as an instructor in certain foreign public universities. [16] Such a limitation, however, is not compelled by the text of the clause — in fact it is not even facially consistent with the text — and would do nothing to further the purpose of the Clause.

Although the definition of an officer for the purpose of the Emoluments Clause is more expansive than for the Appointments Clause, this Office has drawn a distinction in the context of the Appointments Clause between individuals covered by that Clause and individuals who exercise authority that is delegated by federal law that is equally applicable to the Emoluments Clause. As we recently explained:

> It is a conceptual confusion to argue that federal laws delegating authority to state officials create federal "offices," which are then filled by (improperly appointed) state officials. Rather, the "public station, or employment" has been created by state law; the federal statute simply adds federal authority to a pre-existing state office. Accordingly, the substantiality of the delegated authority is immaterial to the Appointments Clause conclusion. An analogous point applies to delegations made to private individuals: the simple assignment of some duties under federal law, even significant ones, does not by itself pose an Appointments Clause problem. [17]

Similarly, we believe it is a conceptual confusion to argue that delegating authority to foreign officials creates federal "offices," which are then filled by (improperly paid) foreign officials. Rather, the office held is a foreign, not a U.S. office; the bilateral agreement merely adds additional authority to an existing foreign office.

---

[15] *Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 520 (1926).

[16] *Cf. Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13 (1994) (concluding that foreign public universities are presumptively instrumentalities of foreign States under the Emoluments Clause).

[17] *The Constitutional Separation of Powers between the President and Congress*, 20 Op. O.L.C. 124, 142 n 52 (1996) (expressly superseding inconsistent prior opinions of this Office regarding the Appointments Clause).

The assignment of some duties under an international executive agreement, even significant ones, does not by itself pose an Emoluments Clause problem.

CHRISTOPHER H. SCHROEDER
*Acting Assistant Attorney General*
*Office of Legal Counsel*